IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MARIA RAMIREZ, | ) | Case No. 5:18-cv-2140 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

## I.     Introduction

Plaintiff, Maria Ramirez, seeks judicial review of the final decision of the Commissioner of Social Security, denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XIV of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Ramirez's applications for DIB and SSI be AFFIRMED.

## II.    Procedural History

On April 16, 2015, Ramirez applied for DIB and SSI.  (Tr. 288-305).[1]  Ramirez alleged that she became disabled on December 23, 2014, due to "lupus, chronic pain, severe headaches, severe fatigue, [and] stomach problems."  (Tr. 289, 298, 300).  The Social Security

---

[1] The administrative transcript is in ECF Doc. 10.

Administration denied Ramirez's applications initially and upon reconsideration.  (Tr. 71-88, 129-68).  Ramirez requested an administrative hearing.  (Tr. 203-04).  ALJ Louis Aliberti heard Ramirez's case on February 24, 2018, and denied the claim in a March 7, 2018, decision. (Tr. 9-70).  On July 24, 2018, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6).  On September 18, 2018, Ramirez filed a complaint to challenge the Commissioner's decision.  ECF Doc. 1.

## III.   Evidence

### A.   Personal, Educational and Vocational Evidence

Ramirez was born on April 14, 1984 and was 30 years old on the alleged onset date.  (Tr. 288-89).  At the time of the ALJ hearing, Ramirez was 5'3" and weighed 255 pounds, giving her a BMI between 45 and 46.[2]  (Tr. 35).  Ramirez graduated from high school and attended three years of college for accounting.  (Tr. 36, 61).  She had past work as a cashier, mortgage loan officer, waitress, and preschool teacher, none of which she could still perform.  (Tr. 21).

### B.   Relevant Medical Evidence

On May 12, 2014, Ramirez told Shanail Berry, MD, that she had a history of fibromyalgia and systemic lupus erythematosus, took medications for her conditions, gained weight, and had pain "everywhere."  (Tr. 465).  Ramirez said that her previous medication helped "a little" with her pain.  (Tr. 465).  On examination, Dr. Berry noted that Ramirez did not have any swelling, rashes, or neurological issues.  (Tr. 466).  Dr. Berry prescribed medications to help Ramirez's symptoms and referred her to a pain clinic.  (Tr. 468).  At a follow-up on March 5, 2015, Ramirez told Dr. Berry that she had knee pain and depression.  (Tr. 445).  On examination, Dr. Berry noted that Ramirez was obese, did not have any swelling in her

---

[2] A height of 5'3" and weight of 255 pounds results in a BMI between 45 and 46.  *See* NAT'L INST. OF HEALTH, Body Mass Index Table 2, *available at* https://www.nhlbi.nih.gov/health/educational/lose_wt/ BMI/bmi_tbl2.htm (last visited June 5, 2019).

extremities, and had normal muscle bulk and tone.  (Tr. 446).  Dr. Berry continued Ramirez's medications, but said she needed a long-term pain plan without narcotic pain relievers.  (Tr. 446).

On June 27, 2014, Ramirez told Riad Laham, MD, that she had generalized body pain and rated her pain as a seven on a ten-point scale.  (Tr. 643).  Ramirez said that opioids, nerve pain medication, and muscle relaxants alleviated her pain.  (Tr. 643).  On examination, Dr. Laham noted that Ramirez was alert and oriented, and she did not have any numbness, weakness, headaches, or dizziness.  (Tr. 644-45).  Ramirez had tender points in all four quadrants "similar to fibromyalgia distribution."  (Tr. 646).  Dr. Laham gave Ramirez a steroid injection and prescribed a nerve pain medication and a muscle relaxant.  (Tr. 646).

On August 8, 2014, Ramirez told Kuldeep Singh, MD, that she had generalized abdominal pain, nausea, diarrhea, and occasional left flank and back pain.  (Tr. 539).  Dr. Singh noted that Ramirez had lupus, a history of fibromyalgia, and immunosuppressant and steroid prescriptions.  (Tr. 539).  On examination, Ramirez had a tender, but "essentially normal," back, and she was alert, awake, and oriented.  (Tr. 539).  A CAT scan revealed an ovarian lesion, and Ramirez was admitted for further observation.  (Tr. 539, 565, 567).

On August 9, 2014, Nadia Mansaur, MD, noted that Ramirez complained of malaise.  (Tr. 541).  Ramirez had pain and stiffness in her extremities, but she denied having a decreased range of motion, swelling, or weakness.  (Tr. 542).  Dr. Mansaur gave Ramirez steroid injections and prescribed an opioid pain reliever.  (Tr. 543).  Lokanathan Anand, MD, noted that Ramirez said she lost 50 pounds over the previous year, but she denied fever, chills, anorexia, malaise, decreased range of motion, pain, swelling, stiffness, and weakness.  (Tr. 548-49).  On examination, Dr. Anand noted that Ramirez had intact range of motion, no joint swelling, normal strength, and intact senses.  (Tr. 550).  Dr. Anand continued Ramirez's medications.  (Tr. 550).

On August 12, 2014, Ramirez told Sandy Thornhill, PA, that she had pain related to her fibromyalgia and lupus.  (Tr. 558).  Ramirez denied having any fever, chills, malaise, decreased range of motion, swelling, stiffness, or weakness.  (Tr. 558-59).  Ramirez said that she had been prescribed continuous opioid pain relievers for five years, but Thornhill told Ramirez that she would not prescribe chronic narcotics.  (Tr. 561).

On September 22, 2014, Ramirez saw Antwon Morton, DO, on referral from Shanail Berry, MD.  (Tr. 451).  Ramirez told Dr. Morton that she'd had a pain flare that started eight days before her visit, and cold weather and stress aggravated her pain.  (Tr. 451).  Dr. Morton noted that Topamax was mildly successful in treating Ramirez's fibromyalgia, and that she took Effexor for depression and Percocet for her pain.  (Tr. 451).  On examination, Ramirez had normal peripheral pulses, no edema, normal breathing, intact skin, no erythema, no ecchymosis or rash, no evidence of trigger points, no evidence of scoliosis, and mildly decreased range of motion.  (Tr. 453).  Ramirez also had tenderness at the lumbosacral junction, iliac crest bilaterally, sacro-iliac joint bilaterally, piriformis bilaterally, greater trochanter bilaterally, thoraco-lumbar paraspinal muscles bilaterally, and lumbo-sacral spinal muscles bilaterally. (Tr. 453-54).  Ramirez's reflexes, motor strength, fine motor coordination, and gait were normal. (Tr. 454).  Dr. Morton diagnosed Ramirez with fibromyalgia, obesity, history of lupus, and history of tobacco use disorder.  (Tr. 454).  He continued Ramirez's medication and recommended yoga and physical therapy to help her lose weight.  (Tr. 454).

On November 14, 2014, Ramirez told Sajid Pervaiz, MD, that she had quit taking her fibromyalgia medications and other medications because she thought she was pregnant. (Tr. 604).  Ramirez said that she had headaches and abdominal pain, but she denied any fevers, chills, skin rashes, neck stiffness, joint pain, swelling, trouble breathing, and trouble swallowing. (Tr. 604).  On examination, Ramirez had good skin perfusion, no focal isolated tenderness in her

4

lower quadrants or suprapubic area, good range of motion, and a steady gait.  (Tr. 604).  She had "some discomfort diffuse in the lower abdominal region."  (Tr. 604).  Ramirez also had "mild obesity."  (Tr. 605).  Dr. Pervaiz prescribed Cipro.  (Tr. 605).

On February 6, 2015, Ramirez told Padmapriya Sivaraman, MD, that she had diffuse arthralgias in her hands, wrists, elbows, knees, and ankles; she had significant joint stiffness; and she had malar rash and alopecia.  (Tr. 498).  Ramirez denied having fevers, chills, shortness of breath, chest pain, and abdominal pain.  (Tr. 498).  Dr. Sivaraman noted that Topamax helped Ramirez's lupus and migraines.  (Tr. 498).  On examination, Ramirez had no evidence of malar rash; she had synovitis in her wrists and MTP joints; and she did not have any evidence of active joint swelling, warmth, or erythema.  (Tr. 499).  Dr. Sivaraman gave Ramirez a Kenalog injection and prescribed prednisone, Topamax, and tramadol.  (Tr. 501).  At a follow-up on March 6, 2015, Ramirez said her fatigue and diffuse arthralgias were progressively worse and she napped throughout the day.  (Tr. 493).  Ramirez also said that she had difficulty with routine daily activities due to joint pain, and she had alopecia, Raynaud's symptoms, and oral ulcers. (Tr. 493).  On examination, Dr. Sivaraman noted that Ramirez had no rashes on her skin, swelling in her hands, mild synovitis in her wrists, and no active joint swelling, warmth, or erythema in her other joints.  (Tr. 494).  She did not have any neurological or psychological issues.  (Tr. 494).  Dr. Sivaraman continued Ramirez's medications.  (Tr. 497).

On April 9, 2015, Ramirez told Randy Curtin, DO, that she had fatigue, tiredness, loose stool or diarrhea, aches, lightheadedness, and a decreased appetite.  (Tr. 580, 582, 584-85). Dr. Curtin noted that Ramirez's exam was "without significant abnormality, except for some slight pressure in the suprapubic area."  (Tr. 580).  Dr. Curtin advised Ramirez to increase clear fluid hydration and return if her symptoms worsened.  (Tr. 582, 584).  Dr. Curtin also gave

Ramirez and antibiotic to treat her for any possible UTI.  (Tr. 580, 585).  After receiving IV fluids, Ramirez told Dr. Curtin that she felt better.  (Tr. 582, 584).

On April 16, 2015, Jenny Sawyer, MD, noted that Ramirez was referred to pain management, but she could not follow through due to insurance issues.  (Tr. 622).  Ramirez said she had pain in her upper and lower abdomen, but it was worse on her right side.  (Tr. 622).  She said that she had diarrhea after she ate and had lost ten pounds.  (Tr. 622).  Ramirez denied having any fevers or chills.  (Tr. 622).  She took double her Prilosec prescription and stopped taking her antianxiety medication because it made her feel tired.  (Tr. 622-23).  On examination, Ramirez was well-developed and well-nourished; she had normal cardiovascular and respiratory functions; she had no joint swelling and normal movement in all extremities; her skin was normal; and she did not have any tenderness.  (Tr. 624).  Dr. Sawyer diagnosed Ramirez with abdominal pain, diarrhea, and nausea, and prescribed medications.  (Tr. 624-25).  Dr. Sawyer stated that she would discuss treatment options for Ramirez's anxiety at a follow-up.  (Tr. 625).  At a follow-up on April 20, 2015, Ramirez said she still had the same symptoms.  (Tr. 616).  On examination, Ramirez's abdomen was tender, but she was otherwise normal.  (Tr. 618).  Dr. Sawyer prescribed Percocet for pain, Lomotil for her gastrointestinal problems, and increased fluids.  (Tr. 621).  Dr. Sawyer also recommended that Ramirez make an appointment with the gastroenterology department.  (Tr. 621).

On April 29, 2015, Ramirez told Dr. Mansour that she had abdominal pain, nausea, and diarrhea.  (Tr. 1240).  Ramirez said that her abdominal pain was constant, crampy, and stabbing, and that it got worse when she ate greasy food.  (Tr. 1240).  Ramirez also said that she had arthralgias and myalgias, but no joint swelling.  (Tr. 1241).  Ramirez denied having any anxiety or depression.  (Tr. 1241).  On examination, Ramirez had diffuse tenderness in her abdomen, but she had no edema or skin issues.  (Tr. 1242).  Dr. Mansour noted that Ramirez's abdominal

problems were "highly likely" be due to irritable bowel syndrome, prescribed abdominal pain medications, and adjusted her lupus medication.  (Tr. 1246).

On June 6, 2015, Molly Friedman, DO, treated Ramirez for vaginal bleeding, urinary frequency, foot pain, lupus, abdominal pain, diarrhea, fibromyalgia, elevated erythrocyte sedimentation rate, and nausea.  (Tr. 789).  On examination, Ramirez was not in any distress, and she was well-developed and well-nourished.  (Tr. 791).  Ramirez's cardiovascular functions, respiratory functions, and abdomen were normal, but she had edema in her joints and erythema in her right foot.  (Tr. 791).  An x-ray did not reveal any dislocations, fractures, or acute bony abnormalities in Ramirez's foot.  (Tr. 791-92, 817).

On September 1, 2015, Ramirez had an "unresponsive episode," which Sharon Tang, MD, and Elizabeth Rosic, CNP, indicated might have been caused by an overdose on her Percocet, tramadol, and Lyrica.  (Tr. 711, 1210); *see also* (Tr. 714) (urine test positive only for opiates).  Diagnostic imaging of Ramirez's head and heart showed mild diffuse cerebral edema, bilateral acute globus pallidus infarctions, and a myocardial infarction.  (Tr. 693, 695, 707-09).  On September 3, 2015, Robert Wilson, DO, noted that Ramirez was doing well, despite her stroke.  (Tr. 760).  On examination, Ramirez had normal range of motion in her back and extremities, no joint swelling or tenderness, full strength in her extremities, and no deficits in her mental status, reflexes, sensation, or coordination.  (Tr. 761).  Dr. Wilson prescribed blood pressure medication.  (Tr. 760, 762).  Dr. Wilson noted that, while hypertension caused Ramirez's stroke, she also had a "mild clotting issue" due to her systemic lupus erythematosus.  (Tr. 768).  On September 4, 2015, Scott Burg, DO, noted that Ramirez was "stable from a rheumatologic standpoint," and that she was prescribed Plaquenil.  (Tr. 774).  Ramirez was discharged on September 4, 2015, and Miodrag Zivic, MD, prescribed her aspirin and statin medications.  (Tr. 714-15, 771-72).

On September 21, 2015, Dr. Friedman saw Ramirez for a follow-up regarding her stroke. (Tr. 784, 826, 867).  Ramirez said Lyrica helped with the numbness and pain from fibromyalgia and lupus.  (Tr. 784, 826, 867).  On examination, Ramirez had normal cardiovascular, pulmonary, abdomen, and psychiatric conditions, but her reflexes were "abnormal."  (Tr. 786-87, 828-29, 869-70).  Dr. Friedman continued Ramirez's medications.  (Tr. 788, 830, 871).  On February 10, 2016, Dr. Friedman noted that Ramirez had more edema in her legs, but her pain had improved with Tramadol and Lyrica.  (Tr. 971).  Ramirez said she felt tired, but she denied any chest pain or shortness of breath.  (Tr. 971).  Dr. Friedman noted that Ramirez had bilateral edema[3] and continued Ramirez's medications.  (Tr. 973, 975).  On May 12, 2016, Dr. Friedman noted that Ramirez was compliant with her medication and denied chest pain, shortness of breath, and edema.  (Tr. 951).  Ramirez said her anxiety and diarrhea were worse due to stress with her kids.  (Tr. 951).  On examination, Ramirez had symmetric reflexes, but various musculoskeletal trigger points were painful to palpation.  (Tr. 953).  Dr. Friedman increased Ramirez's Wellbutrin prescription, referred her to the psychology department, and continued her other medications.  (Tr. 954).  On August 10, 2016, Ramirez said she had depression, anxiety, fatigue, muscle pain, and joint stiffness.  (Tr. 932).  Dr. Friedman noted that Ramirez's fibromyalgia and lupus were unstable, adjusted her medications, referred her to a dietitian to consult for weight loss, and increased her Wellbutrin prescription.  (Tr. 935-36).  At follow-ups on October 5 and November 7, 2016, Dr. Friedman did not note any significant changes in Ramirez's condition, except that she stopped taking her Lyrica and Tramadol and said that her Endocet prescription helped the leg pain that her lupus caused.  (Tr. 913-18).

On May 12, 2016, Ramirez went to the emergency department with lower abdominal pressure.  (Tr. 889).  Ramirez denied having any limb pain, joint pain, swelling, fatigue, weight

---

[3] The record of this visit does not indicate what body parts were edematous.

8

loss, insomnia, or fever.  (Tr. 889-90).  On examination, Randy Curtin, DO, noted that Ramirez had normal physical and neurological conditions.  (Tr. 890).  Ramirez was alert and oriented.  (Tr. 890).  Dr. Curtin treated Ramirez for a urinary tract infection and dysuria.  (Tr. 890).

On June 1, 2016, Ramirez told Jianhua Wang, MD, that she had neck pain, which started after she taught cheer leading classes for a "couple of months" and had to demonstrate to the students.  (Tr. 947).  On examination, Ramirez had neck pain on movement, but her upper and lower extremities, shoulder range of motion, and gait were normal.  (Tr. 949).  Dr. Wang gave Ramirez a soft collar and recommended that she take ibuprofen, ice her neck, and rest.  (Tr. 950).  On September 26, 2016, Ramirez said she had bilateral leg pain, but she denied having any numbness, tingling, or weakness in her feet.  (Tr. 922, 985).  Ramirez also said Percocet helped her pain, but she stopped taking her Lyrica due to leg swelling and tramadol and ibuprofen did not help her pain.  (Tr. 922, 925, 985, 988).  On examination, Ramirez had tenderness in her lower legs and thighs but no tenderness in her spine.  (Tr. 925, 988).  Dr. Wang prescribed Ramirez Percocet and put a hold on her atorvastatin prescription to avoid drug-related myalgia.  (Tr. 925, 988).

On August 15, 2016, Ramirez told Melvin Glover, MD, that she had pain and swelling in both her feet and legs.  (Tr. 928, 990).  Ramirez rated her pain as a 10/10 maximum and 7/10 at the time of her examination.  (Tr. 928, 990).  She also said that walking made her pain worse, and elevating her legs made her pain and swelling better.  (Tr. 928, 990).  On examination, Dr. Glover noted that Ramirez was "morbidly obese;" she had edema in her lower extremities; she had mild tenderness in her lower extremities; and she was alert and oriented.  (Tr. 930, 992).  Dr. Glover noted that Ramirez's edema could be a side effect of her Lyrica prescription, recommended elevating her lower extremities, prescribed a diuretic to reduce swelling, and referred Ramirez to rheumatology.  (Tr. 931, 993).

On November 17, 2016, Ramirez told Riaz Ahmad, MD, that she had excessive fatigue throughout the day, pain in her hands and feet, numbness in her legs, and morning stiffness. (Tr. 904).  Ramirez told Dr. Ahmad that she stopped taking prednisone for her lupus in 2015 due to weight gain and leg swelling, and that oxycodone and ibuprofen gave her "some relief." (Tr. 904).  Ramirez also said that gabapentin and Effexor were helpful, and that Dr. Sivaraman had planned to add Benlysta to her medications, but she could not get those medications due to insurance issues.  (Tr. 904).  Ramirez also said that she had Raynaud's symptoms, patchy hair loss, paresthesia, headaches, anxiety, and depression.  (Tr. 905).  On examination, Ramirez had tenderness in her wrists, elbows, shoulders, and knees, but she had good range of motion in all her extremities.  (Tr. 907).  Ramirez was awake, alert, and oriented.  (Tr. 907).  Dr. Ahmad continued Ramirez's lupus and fibromyalgia medications, added gabapentin, indicated that Benlysta would be added if approved, and said Ramirez could improve her condition by losing weight through diet and exercise.  (Tr. 911).

On January 19, 2017, Ramirez told Kuldeep Singh, MD, that she had wrist pain and left knee pain after she was in a severe car accident.  (Tr. 1173).  Ramirez denied having any weight loss, fatigue, insomnia, fevers, chest pain, shortness of breath, abdominal pain, depression, or anxiety.  (Tr. 1173-74).  Ramirez said walking was painful.  (Tr. 1174).  On examination, Dr. Singh noted that Ramirez did not have any peripheral edema, but she had pain, swelling, and decreased range of motion in her wrist.  (Tr. 1174).  Ramirez's knee was tender, but she had full range of motion and no joint issues.  (Tr. 1174).  Dr. Singh treated Ramirez for acute wrist pain, knee contusion and abrasion, and cervical strain.  (Tr. 1174).

On January 23, 2017, Ramirez saw Dr. Friedman for a follow-up related to her car accident.  (Tr. 965).  Ramirez rated her pain as an 8/10 and said that she had neck soreness, lower back pain, and lower extremity pain.  (Tr. 965).  On examination, Dr. Friedman noted that

Ramirez's wrist was in a cast, her knee had edema and ecchymosis, and she had ropiness diffusely down her spine.  (Tr. 967).  Ramirez was also alert and oriented.  (Tr. 967).

Dr. Friedman diagnosed Ramirez with a distal radius fracture and gave her opioid pain relievers. (Tr. 968).  On February 20, 2017, Ramirez's anxiety flared up due to her car accident, but Ramirez denied depression, chest pain, shortness of breath, edema, and dizziness.  (Tr. 960). Dr. Friedman did not note any significant changes on examination and refilled her medications. (Tr. 962-63).  On June 5, 2017, Ramirez told Dr. Friedman that she wanted to change her gabapentin prescription because she had numbness and pain.  (Tr. 955).  Ramirez said that she was fatigued, but she denied having any dizziness, arthralgias, or skin changes.  (Tr. 955). Dr. Friedman again refilled Ramirez's medications.  (Tr. 958).

On January 24, 2017, J. Robert Anderson, MD, treated Ramirez for her post-accident injuries.  (Tr. 1262-65).  Dr. Anderson noted that Ramirez was alert, oriented, pleasant, and morbidly obese.  (Tr. 1264-65).  Dr. Anderson removed Ramirez's wrist cast, found that there was no erythema, mild ecchymosis, mild dorsal hand and wrist swelling, minimal deformity, full composite finger flexion-extension, good thumb opposition, intact sensation, and capillary refill in less than two seconds.  (Tr. 1265).  Dr. Anderson noted that Ramirez's joint spaces were well-preserved.  (Tr. 1265).  In a patient questionnaire, Ramirez denied having constant fatigue, weight loss/gain, fevers, chills, sweats, headaches, rashes, nail changes, dizziness, nausea, diarrhea, urinary frequency, depression, and skin issues/conditions.  (Tr. 1267).  On March 3, 2017, Dr. Anderson noted that Ramirez's wrist pain had resolved; she had a good range of motion and sensation in her hand and wrist; and she did not have any numbness or tingling. (Tr. 1257, 1259).

On December 14, 2017, Ramirez saw Howard Smith, MD, to enroll in a lupus study. (Tr. 1276).  Ramirez said that she had fatigue, a lupus hairline, cognitive difficulties, arthralgias,

11

pleurisy, foot and leg swelling, sores in her mouth, pain with breathing, abdominal pain, morning stiffness, muscle weakness, back pain, joint pain, joint swelling, rashes, color changes in her hands when it was cold, hair loss, nail changes, headaches, dizziness, numbness, tingling, memory loss, and high blood pressure.  (Tr. 1277-80).  She said that she had mild to moderate pain daily, and that rest and medication helped reduce her pain.  (Tr. 1279).  Ramirez said that she had decreased daily living activities.  (Tr. 1279).  Dr. Smith noted that Ramirez was alert and oriented.  (Tr. 1279).  Dr. Smith also noted that Ramirez was previously diagnosed with fibromyalgia, lupus, Raynaud disease, and tobacco abuse.  (Tr. 1279).  Ramirez said that she felt tired or had little energy nearly every day, but she did not have any trouble with concentrating on things, reading the newspaper, watching television, moving or speaking slowly, fidgeting, restlessness, or moving around more than usual.  (Tr. 1281).

### C. Relevant Opinion Evidence

#### 1. Treating Physician Opinion – Molly Friedman, DO

On August 30, 2017, Ramirez saw Dr. Friedman to fill out disability opinion forms. (Tr. 1310).  Dr. Friedman noted that Ramirez was alert; was in no acute distress; had normal heart and lung functions; had abnormal joints, bones, and muscles; had symmetric reflexes; and had bilateral edema.[4]  (Tr. 1312-13).  Ramirez told Dr. Friedman that she was unfit to work, fatigued, anxious, required rest every two to three hours, had to get up every hour to move due to stiffness, and had numbness in her legs.  (Tr. 1310, 1314).

In evaluating Ramirez's functional limitations, Dr. Friedman stated that Ramirez could only lift or carry up to five pounds.  (Tr. 1271).  Dr. Friedman stated that Ramirez could stand and/or walk for up to 30 minutes at a time.  (Tr. 1271).  Ramirez could sit for six to eight hours in an eight-hour workday, but she had to be able to get up to stretch every hour.  (Tr. 1271).

---

[4] The record of this visit did not indicate what body parts were edematous.

Ramirez could occasionally balance and stoop, but she could never climb, crouch, kneel, or crawl.  (Tr. 1271).  Dr. Friedman said that Ramirez could not tolerate heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes, humidity, vibration, or "other" environmental irritants due to stiffness, pain, fatigue, and swelling.  (Tr. 1271).  Dr. Friedman opined that Ramirez would be absent more than four days per month and off task more than 20% of the workday due to pain or fatigue.  (Tr. 1272).  Ramirez would need to lie down for 30 minutes each workday, she could use her hands for 30% of an 8-hour workday, and she would take more than four unscheduled breaks each day.  (Tr. 1272).  Dr. Friedman said that Ramirez's stiffness, edema, numbness, and pain due to lupus supported her opinion.  (Tr. 1272).

Dr. Friedman also completed a mental assessment.  (Tr. 1273-74).  Dr. Friedman opined that Ramirez would be unlimited in her ability: (1) understand, remember, and carry out short, simple instructions; (2) carry out detailed instructions; (3) sustain an ordinary routine without special supervision; (4) work in coordination with or proximity to others without being distracted by them; (5) make simple work-related decisions; (6) interact appropriately with the general public; (7) ask simple questions or request assistance; (8) accept instructions and respond appropriately to supervisor criticism; (9) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (10) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; (11) respond appropriately to changes in the work setting; and (12) be aware of normal hazards and take appropriate precautions.  (Tr. 1273-74).  Dr. Friedman said Ramirez would have "difficulty . . . no more than 10 percent of the workday or workweek" (the second lowest level of restriction on the opinion form) in her ability to: (1) remember locations and work-like procedures; (2) understand and remember detailed instructions; (3) maintain attention and concentration for extended periods; (4) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;

(5) complete a normal workday and workweek without interruptions from psychologically based symptoms; (6) perform at a constant pace without an unreasonable number and length of rest periods; (7) travel in unfamiliar places or use public transportation; and (8) set realistic goals or make plans independently of others.  (Tr. 1273-74).  Dr. Friedman stated that Ramirez would be absent about two days per month and off-task about 15% of an 8-hour workday.  (Tr. 1274).  Finally, Dr. Friedman indicated that Ramirez would require four 15-to-20-minute breaks each day.  (Tr. 1274).

### 2.    Consultative Psychological Examiner – F. Scott Winstanley, Ph.D.

On February 22, 2016, F. Scott Winstanley, Ph.D., examined Ramirez and completed a psychological evaluation report.  (Tr. 883-87).  Ramirez told Dr. Winstanley that she had a history of anxiety, panic attacks, lupus, fibromyalgia, chronic headaches, chronic fatigue, and stomach problems.  (Tr. 883).  Ramirez said that she could not stand for more than five to ten minutes, she had at least one panic attack per day, and she had to lie down for a few hours after each panic attack.  (Tr. 883).  Ramirez told Dr. Winstanley that she'd had life-long anxiety and a history of depression.  (Tr. 884).  Ramirez said that she lifted with her husband and two children, helped her children get ready for school in the morning, did dishes and laundry, took frequent breaks, and could not do a single task for more than 15 minutes at a time.  (Tr. 884).  Ramirez did not have any difficulty driving, could manage her appointments and medication independently, and managed finances and bills for her household.  (Tr. 884-85).

On examination, Dr. Winstanley noted that Ramirez understood all instructions and questions and responded appropriately.  (Tr. 885).  Ramirez appeared mildly anxious, and she was alert and oriented.  (Tr. 885).  Ramirez was able to carry out simple one-step and multi-step commands without difficulty, and she was able to perform a complex set of three hand movements.  (Tr. 885).  Dr. Winstanley noted that Ramirez had clear and coherent thought

14

processes, normal insight, and an appropriate understanding of social norms and expectations. (Tr. 885).  Based on his evaluation, Dr. Winstanley opined that Ramirez could: (1) understand, remember, and carry out all instructions; (2) maintain attention, concentration, persistence, and pace; (3) perform simple and multi-step instructions; (4) respond appropriately to supervisors and coworkers; and (5) respond appropriately to work pressure.  (Tr. 886-87).

### 3.  State Agency Consultants

On June 17, 2015, state agency consultant Abraham Mikalov, MD, assessed Ramirez's physical limitations based on a review of the medical record.  (Tr. 85-87).  Dr. Mikalov determined that Ramirez did not meet Listing 14.02 (systemic lupus erythematosus), but her medically determinable impairments could be expected to produce pain or other symptoms. (Tr. 85).  Dr. Mikalov determined that Ramirez could lift up to 20 pounds occasionally and 10 pounds frequently; stand and/or walk for up to 6 hours in an 8-hour workday; and sit for up to 6 hours in an 8-hour workday.  (Tr. 86).  Ramirez was unlimited in her ability to push and/or pull. (Tr. 86).  Dr. Mikalov noted that Ramirez had fatigue, but she did not have any limitations in posture, manipulation, vision, communication, or environmental tolerances.  (Tr. 86-87).  On December 28, 2015, William Bolz, MD, concurred with Dr. Mikalov's opinion, except that he found Ramirez could: (1) never climb ropes, ladders, or scaffolds; (2) frequently climb ramps/stairs, stoop, kneel, crouch, and crawl; and (3) balance without limitation.  (Tr. 143). Based on his assessment, Dr. Bolz opined that Ramirez could perform a range of light work. (Tr. 146).

On February 29, 2016, state agency consultant Paul Tangeman, Ph.D., evaluated Ramirez's physical functions based on a review of the medical record.  (Tr. 140-42, 144-45). Dr. Tangeman determined that Ramirez did not meet Listing 12.04 (affective disorders) or Listing 12.06 (anxiety-related disorders).  (Tr. 140).  He stated that Ramirez had only mild

limitations in daily living activities and social functions; moderate difficulties in maintaining

concentration, persistence, and pace; and no repeated episodes of decompensation each of

extended duration.  (Tr. 140).  Dr. Tangeman determined that Ramirez did not have any

limitations in understanding, memory, or social interaction.  (Tr. 144-45).  Ramirez had moderate

limitations in carrying out detailed instructions, maintaining attention and concentration,

completing a normal workday and workweek without interruptions from psychologically based

symptoms, performing at a consistent pace without an unreasonable number and length of rest

periods, and responding appropriately to changes in the work setting.  (Tr. 145).  She did not

have significant limitations in her ability to: (1) understand and remember very short and simple

instructions; (2) perform activities within a schedule, maintain regular attendance, and be

punctual within customary tolerances; (3) sustain an ordinary routine without special

supervision; (4) work in coordination with or in proximity to others without being distracted by

them; (5) make simple work-related decisions; (6) be aware of normal hazards and take

appropriate precautions; (7) travel in unfamiliar places or use public transportation; or (8) set

realistic goals or make plans independently of others.  (Tr. 144-45).[5]

### D.    Relevant Testimonial Evidence

Ramirez testified at the ALJ hearing.  (Tr. 35-57).  In a typical day, Ramirez woke up at

6:00 am, took 20 minutes to get out of bed, got her kids ready for school, ate breakfast, and laid

down for another hour or two.  (Tr. 48, 54-55).  Ramirez made sure her kids were dressed,

brushed their teeth, and had all their school supplies each morning.  (Tr. 48).  She also cooked,

did laundry, and grocery shopped for her household.  (Tr. 49).  When she grocery shopped, her

boyfriend or mother helped, and she used a motorized scooter.  (Tr. 51).  Ramirez said she had to

---

[5] State agency consultant Aracelis Rivera, Psy.D., stated that she could not assess Ramirez's mental functions because Ramirez failed to cooperate by submitting a requested functional limitations form. (Tr. 76).

take breaks in between her chores. (Tr. 55). She did not have any pets or outdoor hobbies, and her indoor hobbies included painting, listening to music, and watching television. (Tr. 49, 55). She could paint for 5 minutes before her hands cramped up and she had to take a 10-to-15-minute break. (Tr. 51). She said that she could walk for 10 minutes before she had "excruciating pain" in her feet and had to sit down for 20 to 30 minutes. (Tr. 46). She said that she could lift no more than 15 pounds and no more than "a cup" continuously. (Tr. 47, 50). She could not do any stooping, kneeling, crouching, crawling, or bending without pain. (Tr. 47). She could sit for 30 minutes before she had to stand and stretch. (Tr. 54). Ramirez took at least one 45-minute nap per day. (Tr. 55-56).

Ramirez testified that she worked as a loan auditor for a bank for eight months in 2008. (Tr. 40). From 2009 through 2010, She worked as a restaurant manager and server. (Tr. 41). Ramirez worked as a waitress for "around three" months in 2013, and quit because she was in "too much pain." (Tr. 38). From November 2013 through January 2014, Ramirez worked as a preschool teacher, and she spent forty percent of that job on her feet. (Tr. 43-44). In 2014, Ramirez worked part-time for four weeks as a banquet receptionist. (Tr. 36). In that position, she stood for sixty percent of the time, folded linen while sitting forty percent of the time, and did not lift anything over five pounds. (Tr. 37). In 2016 through 2017, Ramirez worked part-time as a cashier at Dollar Tree. (Tr. 37). She quit her cashier job because standing at work caused her "a lot of pain" and fatigue. (Tr. 37).

Ramirez testified that she could not work due to her health problems. (Tr. 57). She said she was diagnosed with lupus in 2010, which caused her to feel like she had a cold or had "the chills" sometimes. (Tr. 53). Her hands sometimes turned purple and felt numb, and she had extreme fatigue, foggy memory, muscle pain, joint pain, and chest pain. (Tr 52-53, 56-57). Her pain on a typical day rated as an eight out of ten, but it was worse in the fall and winter. (Tr. 45).

17

Her legs swelled three time a week, and she had to raise them above her heart, use a hot and cold compress, and could not walk for the rest of the day.  (Tr. 52).  She also had rashes, for which she used steroid cream.  (Tr. 53).  Ramirez said that she also had mental symptoms, including long-term and short-term memory loss.  (Tr. 47).  She did not have any problems maintaining attention or concentration; understanding information or instructions; making decisions; or getting along with others.  (Tr. 47).  Ramirez took medications for pain, inflammation, and mental health symptoms, but they caused her to urinate often.  (Tr. 45-46, 52).

Daniel Simone, a vocational expert ("VE"), also testified at the ALJ hearing.  (Tr. 58-68). The ALJ asked the VE whether a hypothetical individual with Ramirez's age, education, and experience could work if she was limited to light work, except that:

> Handling bilateral is limited to frequent.  Fingering bilaterally is limited to frequent.  Feeling bilaterally is limited to frequent.  The following additional postural limitations:  The hypothetical individual can climb ramps and stairs only occasionally; climb ladders, ropes, or scaffolding is limited to never.  Stooping, kneel, crouching, and crawling are all limited to frequent.  The following additional mental limitations:  Understanding, remembering, and carrying out instructions is limited to performing simple, routine, and repetitive tasks but not at a production rate pace – for example, assembly line work.  Dealing with changes in the work setting is limited to simple work-related decisions.

(Tr. 62-63).  The VE said that such an individual could perform Ramirez's past work as a cashier, or she could work as an inspector and hand packager, cafeteria attendant, or router. (Tr. 63-64).  The ALJ asked if the individual described in the first hypothetical could work if she was additionally limited to sedentary work.  (Tr. 64).  The VE testified that such an individual could not perform any of Ramirez's past work or the other work described in response to the first hypothetical, but she could work as a charge account clerk, order clerk, or call-out operator. (Tr. 65).  The VE also testified that a third hypothetical individual could not work if she was: (1) off task 15 percent of an 8-hour workday, in addition to normal breaks; or (2) absent 2 days or more per month.  (Tr. 65-66).

Ramirez's counsel asked the VE whether the first two hypothetical individuals described in the ALJ's questions could work if they were additionally limited to using their hands occasionally due to Raynaud's, swelling, and lupus.  (Tr. 67).  The VE testified that he could not identify any work that such an individual could perform.  (Tr. 67).  The VE also testified that a hypothetical individual could not work if she needed to take two 15-minute breaks in additional to standard breaks or if she needed to take a 5-to-10-minute restroom break each hour.  (Tr. 67-68).  Finally, the VE testified that if a hypothetical individual needed to elevate her legs above her heart, she would not be able to work.  (Tr. 68).  The VE said that any elevation beyond ankle height would be a work-preclusive accommodation.  (Tr. 68).

## IV.    The ALJ's Decision

The March 12, 2018, ALJ decision found that Ramirez was not disabled and denied her applications for DIB and SSI.  (Tr. 12-23).  The ALJ found that Ramirez had the severe impairments of: systemic lupus, fibromyalgia, obesity, depression, and anxiety.  (Tr. 15).

The ALJ determined that Ramirez had no impairment that met or medically equaled the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 15-17).  In evaluating Ramirez's impairments, the ALJ considered whether her impairments met or medically equaled the criteria of Listing 14.02 (Systemic Lupus Erythematosus), the effects of her fibromyalgia under SSR 12-2p, and the effects of her obesity under Listing 1.00(Q) and SSR 02-1p.  (Tr. 15-16).  The ALJ found that Ramirez's impairments, singly and in combination, did not meet the criteria of Listing 14.02, because:

> The evidence fails to reveal joint involvement, as described under the criteria in
> section 1.00; or muscle involvement, as described under the criteria in 14.05; or
> ocular involvement, as described under the criteria in 3.00; or cardiovascular
> involvement, as described under the criteria in 4.00; or digestive involvement, as
> described under the criteria in 5.00; or renal involvement, as described under the
> criteria in 6.00; or hematologic involvement, as described under the criteria in
> 7.00; or skin involvement, as described under the criteria in 8.00; or neurological
> involvement, as described under the criteria in 11.00; or mental involvement, as

19

> described under the criteria in 12.00 OR lesser involvement of two or more
> organs/body systems listed in Paragraph A, with significant, documented,
> constitutional symptoms  and signs of severe fatigue, fever, malaise, and weight
> loss.  The record fails to reveal a moderate level of severity involving at least one
> of the organ/body systems.

(Tr. 16).  The ALJ also determined that Ramirez had only mild limitations in: (1) understanding,

remembering, or applying information; (2) interacting with others; and (3) adapting or managing

herself.  (Tr. 16-17).  Further, the ALJ found that Ramirez had only moderate limitations in

concentration, persistence, and pace, because she was able to watch television and she did not

produce evidence that she was distractible.  (Tr. 17).

> The ALJ determined that Ramirez had the RFC to perform sedentary work, except that:
>
> She can frequently climb ramps and stairs, but she can never climb ladders, ropes,
> or scaffolds.  She can frequently stoop, kneel, crouch, and crawl.  The claimant is
> limited to performing simple, routine, and repetitive tasks, but not at a production
> rate pace (e.g., assembly line work).  The claimant is further limited to simple
> work-related decisions.

(Tr. 17).  In assessing Ramirez's RFC, the ALJ explicitly stated that she "considered all

symptoms" in light of the medical and other evidence in the record.  (Tr. 17).  The ALJ expressly

considered Ramirez's subjective complaints – including her: (1) allegations that she was disabled

due to lupus, chronic pain, severe headaches, severe fatigue, stomach problems, and

fibromyalgia; (2) testimony that her pain rated an 8 out of 10 and that she urinated frequently,

required numerous breaks, could not lift more than 15 pounds, and had trouble crouching,

crawling, and bending without pain; (3) her testimony that she had depression and memory loss;

and (4) her statements to providers regarding her fatigue, joint pain, general malaise, obesity, and

anxiety.  (Tr. 18-19).  The ALJ noted that, despite Ramirez's subjective complaints, the medical

records indicated that she had received only conservative treatment and examination findings

were generally unremarkable or mild.  (Tr. 18-19).  The ALJ found that, although Ramirez's

impairments could be reasonably expected to cause the alleged symptoms, her "statements

20

concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record."  (Tr. 18).  Nevertheless, the ALJ noted that, to the extent he found Ramirez's complaints consistent with the other evidence in the record, he accommodated for Ramirez's symptoms by limiting her RFC to sedentary and simple work.  (Tr. 19-20).

The ALJ stated that Dr. Friedman's opinion was not controlling and due "little weight." (Tr. 20).  The ALJ explained that Dr. Friedman was not a specialist in psychiatry, and that her opinion conflicted with her own examination notes.  (Tr. 20-21).  Specifically, the ALJ stated that Dr. Friedman's notes indicated that Ramirez had only situational anxiety and depression, did not require specialist care, was fairly active, and made significant progress with medication. (Tr. 21).  Further, the ALJ noted that Ramirez's counsel designed the form Dr. Friedman used, and that it "provided somewhat misleading and ambiguous definitions and categorizations with relation to Social Security rules."  (Tr. 21).

The ALJ also stated that he gave "great weight" to Dr. Tangeman's opinion, because it was consistent with Ramirez's health records, conservative treatment history, and testimony.[6] (Tr. 20).  The ALJ noted that, although the Paragraph B criteria were modified after Dr. Tangeman issued his opinion, the ALJ had "attempted to approximate and adapt the findings of the State Agency in the assessment of" whether Ramirez had an impairment or combination of impairments that met or equaled a listed impairment.  (Tr. 20).

---

[6] The ALJ actually stated that he gave great weight to the opinions of the "State agency psychological examiners," and cited to Dr. Rivera's and Dr. Tangeman's reports.  (Tr. 20).  Dr. Rivera, however, could not evaluate Ramirez's psychological functions because Ramirez did not comply with a request for information.  (Tr. 76).  Thus, the only "state agency psychological examiner" opinion in the record was Dr. Tangeman's opinion.

21

Because the ALJ found that Ramirez was not able to perform all or substantially all of the requirements of sedentary work, he relied on the VE's testimony to determine that Ramirez could do jobs available in the national economy.  (Tr. 22).

Based upon his findings, the ALJ determined that Ramirez was not disabled from December 23, 2014, through the date of his decision and denied Ramirez's applications for DIB and SSI.  (Tr. 22).

## V.    Law & Analysis

### A.    Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. §§ 405(g), 1383(c)(3); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion.  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re weigh the evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  If supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive – even if this court might reach a different conclusion or if the evidence could have supported a different conclusion.  42 U.S.C. §§ 405(g), 1383(c)(3); *see also Elam*, 348 F.3d at 125 ("The decision must be affirmed if . . . supported by substantial evidence, even if that evidence could support a contrary decision."); *Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record.").  This is so because the Commissioner enjoys a "zone of choice"

within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if supported by substantial evidence, however, the court will not uphold the Commissioner's decision when the Commissioner failed to apply proper legal standards, unless the error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting Sarchet v. Charter, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant

can perform her past relevant work in light of her RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. §§ 404.1512(a), 416.912(a).

### B. Listing 14.02 (Systemic Lupus Erythematosus)[7]

Ramirez argues that the ALJ improperly failed to consider whether she had an impairment or combination of impairments that met or medically equaled the criteria in Listing 14.02 (Systemic Lupus Erythematosus). ECF Doc. 13 at 17. Specifically, Ramirez contends that, in determining that she did not satisfy Listing 14.02's criteria, the ALJ failed to consider all her symptoms, including her obesity and fibromyalgia. *Id.* at 17-19. Further, Ramirez asserts that the ALJ should have found that she met Listing 14.02's criteria because she had: (1) severe fatigue and malaise; (2) marked limitations in completing tasks in a timely fashion; (3) involvement of skin (Raynaud's Syndrome); (4) neurological and mood disorders (anxiety, depression, and memory problems); and (5) immune system disorder (arthralgias and fibromyalgia). *Id.* at 17-18.

The Commissioner responds that the ALJ properly determined that Ramirez did not have an impairment or combination of impairments that met or medically equaled Listing 14.02's criteria. ECF Doc. 15 at 5-8. The Commissioner contends that Ramirez did not meet her burden to show that she had: (1) moderate organ/body system involvement; (2) significant constitutional

---

[7] For the court's ease of analysis, I examine the issues Ramirez raises in an order different than she argued them.

symptoms; or (3) marked limitations in daily living activities, social functioning, or timely completing tasks.  *Id.* at 6.  The Commissioner asserts that, despite Ramirez's subjective complaints that she had severe fatigue and malaise, her medical records do not any objective clinical findings supporting those claims.  *Id.* at 6-7.  The Commissioner also argues that Ramirez has not alleged that she had any other severe constitutional, such as weight loss or fevers.  *Id.* at 7.  Further, the Commissioner contends that the ALJ adequately considered Ramirez's obesity and fibromyalgia throughout his written decision.  *Id.* at 7-8.

At Step Three, the claimant has the burden to of proving that she has an impairment or combination of impairments that meet or medically equal a listed impairment.  *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  The claimant is conclusively presumed disabled if she meets or medically equals a listed impairment; otherwise, the evaluation proceeds to the fourth step.  20 C.F.R. § 404.1520(d)-(e), 416.920(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers v. Comm'r of SSA*, 582 F.3d 647, 653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet the listing.").  "If . . . the record raises a substantial question as to whether the claimant could qualify as disabled under a listing, the ALJ should discuss that listing."  *Sheeks v. Comm'r of SSA*, 544 F. App'x 639, 641 (6th Cir. 2013) (quotation and alterations omitted); *see also Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 415–16 (6th Cir. 2011) (holding that the ALJ erred by not conducting any Step Three evaluation of the claimant's physical impairments, when the ALJ found that the claimant had the severe impairment of back pain).  Nonetheless, "the ALJ need not discuss listings that the applicant clearly does not meet, especially when the claimant does not raise the listing before the ALJ."  *Sheeks*, 544 F. App'x at 641; *see also Hutchinson v. Bowen*, 787 F.2d 1461, 1463 (11th Cir. 1986) (stating that, when an ALJ "did not explicitly state that the appellant's impairments were not contained in the listings, such a determination was

25

implicit in the ALJ's decision" because he proceeded to Step Four).  When an ALJ fails to

explain adequately why the claimant's impairments did not meet or medically equal a listed

impairment, that error is harmless if the claimant does not produce sufficient evidence to show

that her impairments met or medically equaled a listed impairment.  *See Forrest v. Comm'r of

Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014).

Listing 14.02 defines categorically disabling systemic lupus erythematosus.  20 C.F.R. Pt.

404, Subpt. P, App. 1 § 14.02.  To meet the Listings' severity level for systemic lupus

erythematosus, the claimant must show that she/he has a medically documented diagnosis of

lupus, with:

> (A) Involvement of two or more organs/body systems, with: (1) One of the
> organs/body systems involved to at least a moderate level of severity; and (2) At
> least two of the constitutional symptoms or signs (severe fatigue, fever, malaise,
> or involuntary weight loss);
>
> OR
>
> (B) Repeated manifestations of SLE, with at least two of the constitutional
> symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and
> one of the following at the marked level: (1) Limitation of activities of daily
> living; (2) Limitation in maintaining social functioning; (3) Limitation in
> completing tasks in a timely manner due to deficiencies in concentration,
> persistence, or pace.

20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 14.00(D), 14.02.  Organ or body system involvement may

include: (1) respiratory issues (pleuritis, pneumonitis); (2) cardiovascular issues (endocarditis,

myocarditis, pericarditis, vasculitis); (3) renal issues (glomerulonephritis); (4) hematologic issues

(anemia, leukopenia, thrombocytopenia); (5) skin problems (photosensitivity); (6) neurological

issues (seizures); (7) mental symptoms (anxiety, fluctuating cognition, "lupus fog," mood

disorders, organic brain syndrome, psychosis); or (8) immune system disorders (inflammatory

arthritis).  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 14.00(D)(1).

Although obesity is not a listed impairment, an ALJ must consider whether a claimant's severe impairment of obesity: (1) causes functional limitations that combine with the claimant's other impairments to meet the criteria for a listed impairment; or (2) causes such severe functional limitations, singly or in combination with other impairments, that it equals a listed impairment.  SSR 02-1p, 2002 SSR LEXIS 1 at *12-15 (Sept. 12, 2002).[8]  For example, severe obesity could satisfy a listing criterion that requires "a physical impairment imposing an additional and significant work-related limitation."  *Id.* at *13.  Obesity might also have musculoskeletal, respiratory, or cardiovascular effects that combine with a claimant's other impairments to meet or medically equal a listing.  *Id.* at *13-15.  Further, a claimant's obesity alone might equal a listed impairment if the record shows that it "result[ed] in an inability to ambulate effectively . . . with the involvement of one major peripheral weight-bearing joint in listing 1.02(A)."  *Id.* at *14; *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.02(A) (identifying the weight-bearing joints as the "hip, knee, or ankle").  Similarly, an ALJ must consider whether a claimant's fibromyalgia, singly or in combination with other medically determinable impairments, causes functional limitations that medically equal a listed impairment.  SSR 12-2p, 2012 SSR LEXIS 1 *17 (Jul. 25, 2012).

The ALJ applied proper legal standards and reached a conclusion supported by substantial evidence when he determined that Ramirez did not have any impairment or combination of impairments that met or medically equaled a listed impairment.  42 U.S.C. §§ 405(g), 1383(c)(3); *Elam*, 348 F.3d at 125.  Here, the ALJ complied with the regulations when

---

[8] On May 20, 2019, the Social Security Administration published SSR 19-2p, which rescinded and replaced the guidelines for evaluating obesity under SSR 02-1p.  SSR 19-2p (May 20, 2019).  Because the Social Security Administration stated that SSR 19-2p applies only to applications filed on or after May 20, 2019, SSR 19-2p lacks retroactive effect and SSR 02-1p applies to Ramirez's claims.  *See* SSR 19-2p; *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("Retroactivity is not favored in the law . . . and administrative rules will not be construed to have retroactive effect unless their language requires this result.").

he: (1) considered whether Ramirez's medically determinable impairments – including her lupus, obesity, and fibromyalgia – singly or in combination met or medically equaled the criteria for categorically disabling systemic lupus erythematosus; and (2) explained that Ramirez's impairments did not meet or medically equal the Listings criteria. *Foster*, 279 F.3d at 354; 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 1.02(A), 14.00(D), 14.02; SSR 02-1p, 2002 SSR LEXIS 1 *12-15; SSR 12-2p, 2012 SSR LEXIS 1 *17; (Tr. 15-17).  Specifically, the ALJ explained that Ramirez's lupus, obesity, and fibromyalgia did not, singly or in combination, meet Listing 14.02 because evidence did not reveal: (1) a moderate (or greater) level of severity involving the joint, muscle, ocular, cardiovascular, digestive, renal, hematologic, skin, neurological, or mental systems; (2) significant constitutional symptoms or signs of severe fatigue, fever, malaise, and weight loss; or (3) more than mild limitations in understanding, remembering, applying information, interacting with others, adapting, managing herself, and maintaining concentration, persistence, and pace.  20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 1.02(A), 14.00(D), 14.02; SSR 02-1p, 2002 SSR LEXIS 1 *12-15; SSR 12-2p, 2012 SSR LEXIS 1 *17; (Tr. 16-17).  Further, the ALJ explicitly considered the whole record and all of Ramirez's symptoms in evaluating her impairments.  (Tr. 15-17).

Substantial evidence also supported the ALJ's conclusion that Ramirez's impairments did not meet or equal the Listing criteria.  42 U.S.C. §§ 405(g), 1383(c)(3); *Elam*, 348 F.3d at 125. Here, evidence in the medical record supported the ALJ's conclusion that Ramirez's lupus, fibromyalgia, and obesity did not meet or medically equal listings-level severity, including: (1) notes indicating that she adequately controlled her lupus, fibromyalgia, pain, anxiety, and depression through medications; (2) treatment notes indicating that she could control her obesity through physical therapy, diet, and exercise; (3) her own statements denying fevers, weight loss, swelling, rashes, neurological issues, decreased range of motion, cardiovascular issues,

respiratory issues, joint pain, and chest pain; (4) treatment notes finding that she was alert and oriented, and had intact to mildly decreased range of motion, normal muscle strength, normal gait, intact senses, normal respiratory functions, normal cardiovascular functions, no swelling, no weakness, no headaches, no dizziness, normal reflexes, good fine motor coordination, and a normal neurological condition; and (5) Ramirez's statement to Dr. Wang that she was able to teach and demonstrate cheerleading for "a couple of months" in 2016.  (Tr. 451, 453-54, 465-66, 478, 494, 497-99, 501, 542, 548-50, 558-59, 582, 584, 604-05, 618, 621, 624, 643-46, 714-15, 760-62, 771-72, 774, 786-87, 791, 889-90, 904, 907, 911, 913-18, 922, 925, 930-31, 935-36, 943, 947, 949, 951, 953-54, 958, 960, 962-63, 967, 971, 975, 1173-74, 1241, 1246, 1257-59, 1264-65, 1267, 1279).  Ramirez's hearing testimony also supported the ALJ's conclusions, including her statements that: (1) she could take care of her kids, cook, do laundry, and grocery shop; (2) she could watch television; and (3) she had no problems maintaining attention and concentration, understanding information or instructions, making decisions, or getting along with others.  (Tr. 47-49, 54-55).  Further, opinion evidence supported the ALJ's conclusions, including: (1) Dr. Friedman's opinion that Ramirez could understand, remember, and carry out short simple instructions, make simple work-related decisions, sustain an ordinary routine without special supervision; and (2) Dr. Winstanley's opinion that Ramirez could understand, respond appropriately to, and carry out single and multi-step instructions.  (Tr. 885).  Although some evidence in the record could have supported a finding that Ramirez met listing criteria – including her occasional complaints of fatigue, malaise, decreased daily living activities, some weight loss, pain, and tenderness – this court is not allowed to re-weigh the evidence or decide facts anew when, as in this case, substantial evidence supports the ALJ's decision.  42 U.S.C. §§ 405(g), 1383(c)(3); *Jones*, 336 F.3d at 476; *Elam*, 348 F.3d at 125; *Rogers*, 486 F.3d at 241; (Tr. 453-54, 541, 548-49, 558-59, 904, 911, 935-36, 953, 1276, 1279).

I recommend that the court affirm the ALJ's conclusion that Ramirez did not have any impairment or combination of impairments that met or medically equaled a listed impairment.

### C.    Medical Opinion Evidence

Ramirez argues that the ALJ failed to apply proper legal standards and reach a decision supported by substantial evidence in weighing the medical opinion evidence.  ECF Doc. 13 at 14-17.  Specifically, Ramirez asserts that the ALJ reasons for rejecting Dr. Friedman's opinion – that it was inconsistent with the objective medical evidence – was not a good reason, because Dr. Friedman was a treating physician and based her opinion on her own observations over a "lengthy" treatment relationship.  *Id.* at 15, 17.  Ramirez contends that other evidence in the record supported Dr. Friedman's opinion, including findings that she had diffuse arthralgias, fatigue, malaise, significant joint pain and/or stiffness, chronic pain, Raynaud's symptoms, tender trigger points, abnormal reflexes, migraines, and edema.  *Id.* at 15.  Further, Ramirez argues that the ALJ erroneously gave great weight to the state agency psychological consultant's (Dr. Tangeman) opinion, because the Paragraph B criteria changed after he issued his opinions.[9] *Id.* at 15.

The Commissioner responds that the ALJ properly weighed the medical opinion evidence.  ECF Doc. 15 at 8-11.  The Commissioner argues that inconsistency with other record evidence is a "good reason" for rejecting a treating physician's opinion.  *Id.* at 10-11.  Further, the Commissioner argues that the ALJ complied with the regulations when he explained that Dr. Friedman's opinion was due "little weight," because it was inconsistent with the normal examination findings in her own treatment notes.  *Id.* at 10.

---

[9] Ramirez states that she challenges the ALJ's decision to give great weight to the "State Agency psychological examiners" opinions.  ECF Doc. 13 at 15.  As discussed above, ALJ gave great weight only to state agency consultant Dr. Tangeman's psychological evaluation – which the ALJ identified as the "State agency psychological examiners" opinions.  (Tr. 20).

At Step Four, an ALJ must weigh every medical opinion that the Social Security Administration receives.  20 C.F.R. §§ 404.1527(c), 416.927(c).[10]  An ALJ must give a treating physician's opinion controlling weight, unless the ALJ articulates good reasons for discrediting that opinion.  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).  "Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'"  *Id.* (quoting 20 C.F.R. § 404.1527(c)(2)).  Good reasons for rejecting a treating physician's opinion may include that: "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  *See Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (quotation omitted); 20 C.F.R. §§ 404.1527(c), 416.927(c).  Inconsistency with nontreating or nonexamining physicians' opinions alone is not a good reason for rejecting a treating physician's opinion.  *See Gayheart*, 710 F.3d at 377 (stating that the treating physician rule would have no practical force if nontreating or nonexamining physicians' opinions were sufficient to reject a treating physician's opinion).

If an ALJ does not give a treating physician's opinion controlling weight, he must determine the weight it is due by considering the length of the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist.  *See Gayheart*, 710 F.3d at 376; 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).  Nothing in the regulations requires the ALJ to explain how he considered each of the factors.  *See* 20 C.F.R. §§ 404.1527(c), 416.927(c).  Nevertheless,

---

[10] 20 C.F.R. §§ 404.1527, 416.927 applies to Ramirez's claims because she filed them before March 27, 2017.

the ALJ must provide an explanation "sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight."  *Gayheart*, 710 F.3d at 376; *see also Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight he actually assigned.").  When the ALJ fails to adequately explain the weight given to a treating physician's opinion, or otherwise fails to provide good reasons for rejecting a treating physician's opinion, remand is appropriate.  *Cole*, 661 F.3d at 939.

"[O]pinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'"  *Gayheart*, 710 F.3d at 376.  Instead, an ALJ must weigh such opinions based on: (1) the examining relationship; (2) the degree to which supporting explanations consider pertinent evidence; (3) the opinion's consistency with the record as a whole; (4) the physician's specialization related to the medical issues discussed; and (5) any other factors that tend to support or contradict the medical opinion.  *Id.*; 20 C.F.R. §§ 404.1527(c), 416.927(c).  Generally, an examining physician's opinion is due more weight than a nonexamining physician's opinion.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Gayheart*, 710 F.3d at 375.  An ALJ does not need to articulate good reasons for rejecting a nontreating or nonexamining opinion.  *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (declining to address whether an ALJ erred in failing to give good reasons for not accepting non-treating physicians' opinions).  An ALJ may rely on a state agency consultant's opinion and may give it greater weight than other nontreating physician's opinions if it is supported by the evidence.  *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 274 (6th Cir. 2015).

Notwithstanding the requirement that an ALJ consider and weigh medical opinion evidence, the ALJ is not required to give any deference to opinions on issues reserved to the

Commissioner.  20 C.F.R. §§ 404.1527(d), 416.927(d).  These issues include: (1) whether a claimant has an impairment or combination of impairments that meets or medically equal an impairment in the Listing of Impairments; (2) the claimant's RFC; (3) the application of vocational factors; and (4) whether a claimant is "disabled" or "unable to work."  20 C.F.R. §§ 404.1527(d)(1)-(2), 416.927(d)(1)-(2).

The ALJ applied proper legal standards in weighing the medical opinion evidence.  42 U.S.C. §§ 405(g), 1383(c)(3); *Elam*, 348 F.3d at 125.  The ALJ complied with the regulations by specifically stating that: (1) Dr. Friedman's opinion was not due controlling weight, and was instead due only "partial weight"; and (2) Dr. Tangeman's opinion was due "great weight."  20 C.F.R. §§ 404.1527(c), 416.927(c); (Tr. 20).  The ALJ adequately explained that he discounted Dr. Friedman's opinion because it was inconsistent with her own treatment notes, which indicated that Ramirez had only situational anxiety and depression, did not require specialist care, and made significant progress with medication.  *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); *Gayheart*, 710 F.3d at 376; *Cole*, 661F.3d at 938; (Tr. 20-21).  Further, the ALJ was permitted to rely on Dr. Tangeman's opinion, because he explained that it was consistent with other evidence in the record, including Ramirez's testimony.  *Reeves*, 618 F. App'x at 274; (Tr. 20).  Moreover, the subsequent change in the Paragraph B criteria for mental impairment listings, did not preclude the ALJ from relying on Dr. Tangeman's opinion, because: (1) the ALJ acknowledged that the Paragraph B criteria had changed; and (2) assessing whether a claimant meets listing criteria is a matter reserved to the Commissioner.  20 C.F.R. §§ 404.1527(d), 416.927(d); (Tr. 20).

Substantial evidence also supported the ALJ's reasons for discounting Dr. Friedman's opinion and giving "great weight" to Dr. Tangeman's opinion.  42 U.S.C. §§ 405(g), 1383(c)(3); *Elam*, 348 F.3d at 125.  Here, the extreme limitations in Dr. Friedman's opinion – including her

33

opinions regarding Ramirez's absenteeism and off-task behavior – conflicted with her examination and treatment notes, showing that: (1) Ramirez was able to sit for six to eight hours in an eight-hour workday; (2) she could understand, remember, and carry out short, simple instructions , make simple work-related decisions, and sustain an ordinary routine without special supervision; (3) she had only mild mental limitations; (4) her physical and mental health symptoms improved with medication ; (5) she told Dr. Friedman that she was doing okay in August 2016 and denied having any depression in February 2017; and (6) at the August 30, 2017, examination Dr. Friedman noted that Ramirez was alert, in no accouter distress, had normal heart and lung functions, and had symmetrical reflexes. (Tr. 784, 788, 826, 830, 867, 871, 913-18, 935-36, 954, 958, 960, 962-63, 971, 1273-74, 1312-13). Further, Dr. Friedman's treatment notes never indicated that Ramirez was late to appointments, missed appointments, or was unable to cooperate during her appointments. Substantial evidence also supported the ALJ's conclusion that Dr. Tangeman's opinion was consistent with other evidence in the record, including: (1) treatment notes and Ramirez's testimony that her symptoms were controlled with medication; (2) Ramirez's testimony that she could take care of kids, do laundry, grocery shop, and watch television, and that she did not have any attention, concentration, understanding, decision-making, or social problems; (3) Dr. Winstanley's opinion that Ramirez could manage appointments, perform complex hand movements, carry out single and multi-step instructions; and (4) Dr. Friedman's opinion that Ramirez had only mild mental limitations and had no deficits in understanding and following short instructions, making simple work-related decisions, and sustaining an ordinary routine. (Tr. 45-49, 54-55, 451, 454, 465, 478, 497, 501, 550, 582, 584, 605, 621, 643, 646, 714-15, 760, 762, 771-72, 774, 786-87, 884-85, 904, 911, 913-18, 925, 931, 935-36, 943, 954, 958, 962-63, 971, 975, 1246, 1273-74, 1279).

Thus, because substantial evidence supported the ALJ's conclusions that Dr. Friedman's opinion was inconsistent with her own examination and treatment notes, and Dr. Tangeman's opinion was consistent with other evidence in the record, the ALJ's decision to give only partial weight to Dr. Friedman's opinion and great weight to Dr. Tangeman's opinion was within the Commissioner's "zone of choice."  *Mullen*, 800 F.2d 535, 545.  I recommend that the court reject Ramirez's argument that the ALJ failed to apply proper legal standards and reach a conclusion supported by substantial evidence in weighing the medical opinion evidence.

### D.      Subjective Symptom Complaints and RFC

Ramirez argues that the ALJ improperly rejected her subjective symptom complaints. ECF Doc. 13 at 20-22.  Specifically, Ramirez contends that the ALJ failed to properly evaluate her complaints regarding the limiting effects of her fibromyalgia and obesity under SSR 12-2p and SSR 02-1p, and that the ALJ improperly "made conclusions acting as if he was the treating physician."  *Id.* at 18, 21-22.  Further, Ramirez asserts that the ALJ disregarded evidence supporting her subjective complaints, including evidence that she had diffuse arthralgias, fatigue, malaise, significant joint pain and/or stiffness, Raynaud's symptoms, tender trigger points, abnormal reflexes, migraines, and edema.  *Id.* at 22.  Ramirez also argues that the ALJ's RFC finding should have included the absenteeism and off-task behavior limitations in Dr. Friedman's opinion.  *Id.* at 23-24.

The Commissioner responds that the ALJ applied proper legal standards and reached a decision supported by substantial evidence in evaluating Ramirez's subjective symptom complaints.  ECF Doc. 15 at 11-13.  The Commissioner argues that the ALJ complied with the regulations by considering whether her subjective complaints were consistent with the objective medical evidence and opinion evidence in the record.  *Id.* at 11-12.  The Commissioner also asserts that Ramirez's "often unremarkable" examination findings supported the ALJ's

conclusion that her subjective complaints were inconsistent with other evidence in the record. *Id.* at 12.  Further, the Commissioner contends that the ALJ "did not 'play doctor,'" but instead properly evaluated her RFC based on the medical and evidence and included RFC limitations based on Ramirez's complaints to the extent they were consistent with the other evidence.  *Id.* at 12-13.  The Commissioner argues that the ALJ was not required to incorporate into the RFC finding the absenteeism and off-task behavior limitations in Dr. Friedman's opinion, because he did not credit Dr. Friedman's opinion.  *Id.* at 13.

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. §§ 404.1520(e), 416.920(e).  The RFC is an assessment of a claimant's ability to do work despite her impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant.  20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms.  *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989).  Nevertheless, an ALJ is not required to accept a claimant's subjective symptom complaints and may properly discount the claimant's testimony about her symptoms when it is inconsistent with objective medical and other evidence.  *See Jones*, 336 F.3d at 475–76; SSR 16-3p, 2016 SSR LEXIS 4 *15 (Oct. 25, 2017) ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical

evidence and the other evidence.").  In evaluating a claimant's subjective symptom complaints, an ALJ may consider several factors, including the claimant's daily activities, the nature of the claimant's symptoms, the claimant's efforts to alleviate her symptoms, the type and efficacy of any treatment, and any other factors concerning the claimant's functional limitations and restrictions.  SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).

Ordinarily, a claimant must substantiate her pain complaints by pointing to objective medical evidence that her medical condition: (1) actually caused severe pain; or (2) is so severe that it would be reasonably expected to cause the alleged pain.  *Blankenship*, 874 F.2d at 1123 (citing *McCormick v. Sec'y of Health & Hum. Servs.*, 861 F.2d 998, 1003 (6th Cir. 1988), and *Duncan v. Sec'y of Health & Hum. Servs.*, 801 F.2d 847 (6th Cir. 1986)).  Nevertheless, such objective evidence is often unavailable when fibromyalgia is the underlying condition.  *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007); *Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003) (noting that, due to the "elusive" and "mysterious" nature of fibromyalgia, medical evidence confirming the alleged severity of the impairment almost never exists).  When the severity and limiting effects of fibromyalgia pain cannot be confirmed by objective medical evidence, the ALJ must:

> consider all of the evidence in the case record, including the [claimant's] daily activities, medications or other treatments the [claimant] uses, or has used, to alleviate symptoms; the nature and frequency of the [claimant's] attempts to obtain medical treatment for symptoms; and statements by other people about the [claimant's] symptoms.

SSR 12-2p, 2012 SSR LEXIS 1 *14 (Jul. 25, 20112).

When obesity is one of the alleged causes of the claimant's impairments, the ALJ must consider whether her obesity causes any exertion, posture, or manipulation limitations that would impact her ability to perform or sustain movement and necessary physical activity in the work environment.  SSR 02-1p, 2002 LESIS 1 at *16-17.  Further, the ALJ should consider whether the claimant's obesity causes any fatigue, drowsiness, mental clarity, or social functioning problems.  *Id.*  Finally, the ALJ must "explain how [he] reached [his] conclusions on whether obesity caused any physical or mental limitations."  *Id.* at *18.

If an ALJ discounts or rejects a claimant's subjective complaints, he must state clearly his reasons for doing so.  *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).  Nevertheless, an ALJ's decision need not explicitly discuss each of the factors.  *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)).  While the ALJ must discuss significant evidence supporting his decision and explain his conclusions with sufficient detail to permit meaningful review, there is no requirement that the ALJ incorporate all the information upon which he relied into a single tidy paragraph.  *See Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–79 (6th Cir. 2010) (noting that the court "read[s] the ALJ's decision as a whole and with common sense").

The ALJ applied proper legal standards and reached a conclusion supported by substantial evidence in evaluating Ramirez's subjective symptom complaints and RFC.  42 U.S.C. §§ 405(g), 1383(c)(3); *Elam*, 348 F.3d at 125.  The ALJ complied with the regulations by: (1) considering all of Ramirez's impairments – including her fibromyalgia and obesity – in light of the medical and other evidence in the record; and (2) clearly explained that he rejected Ramirez's subjective symptom complaints because her testimony concerning the intensity,

38

persistence, and limiting effects of her symptoms was not consistent with the medical and other

evidence.  20 C.F.R. §§ 404.1520(e), 404.1529(c)(3), 416.920(e), 416.929(c)(3); SSR 96-8p,

1996 SSR LEXIS 5; SSR 16-3p, 2016 SSR LEXIS 4; SSR 02-1p, 2002 LESIS 1 at *18; *Felisky*,

35 F.3d at 1036; (Tr. 17-19).  Further, reading the ALJ's decision as a whole, the ALJ did not fail

to consider evidence, rely only upon the objective medical evidence, cherry-pick the evidence, or

play doctor.  *Buckhannon*, 368 F. App'x at 678-79.  Instead, the ALJ complied with the

regulations and applicable Social Security Rulings by considering all the evidence in the

longitudinal record, including the objective medical findings, Ramirez's testimony regarding her

symptoms and daily activities, her conservative treatment history, and the medical opinion

evidence.  20 C.F.R. §§ 404.1520(e), 404.1529(c)(3), 416.920(e), 416.929(c)(3); SSR 96-8p,

1996 SSR LEXIS 5; SSR 16-3p, 2016 SSR LEXIS 4; SSR 02-1p, 2002 LESIS 1 at *18;

(Tr. 15-21).  Moreover, to the extent the ALJ found Ramirez's subjective complaints credible –

*e.g.*, the effects of her obesity and pain on posture, pace, and mental clarity – the ALJ controlled

for Ramirez's symptoms and impairments by limiting her to a reduced range of sedentary work

involving simple tasks and decisions.  (Tr. 17, 19-20).

  Substantial evidence also supported the ALJ's conclusion that Ramirez's subjective

complaints were not consistent with other evidence in the record and that his RFC finding

adequately accounted for her functional limitations.  42 U.S.C. §§ 405(g), 1383(c)(3); *Elam*, 348

F.3d at 125.  Such evidence includes: (1) Ramirez's conservative treatment history, showing

improvement with medications; (2) generally mild or unremarkable examination findings,

indicating that she retained normal muscle strength, range of motion, ambulation, and fine motor

coordination; (3) treatment notes indicating that Ramirez could control her obesity symptoms

through diet and exercise; (4) Ramirez's testimony that she could take care of her kids, cook, do

laundry, grocery shop, and watch television; (5) Ramirez's testimony and medical opinions

indicating that Ramirez could maintain attention and concentration, understand information and instructions, and get along with others; (5) Dr. Winstanley's opinion that Ramirez could adequately manage her appointments and the lack of notes indicating Ramirez was late or failed to appear at appointments; and (6) Dr. Mikalov's and Dr. Bolz's opinions that Ramirez had only moderate physical limitations.  (Tr. 47-49, 54-55, 85-86, 140-45, 451, 453-54, 465, 478, 494, 497, 499, 501, 550, 582, 584, 604-05, 618, 621, 624, 643, 644-46, 714-15, 760-62, 771-72, 774, 786-87, 791, 884-85, 890, 904, 907, 911, 913-18, 925, 930-31, 935-36, 943, 949, 953-54, 958, 962-63, 967, 971, 975, 1174, 1246, 1257-59, 1264-65, 1273-74, 1279).

Because the ALJ applied proper legal standards in evaluating Ramirez's subjective symptom complaints and RFC, and because his conclusions were supported by substantial evidence, the ALJ's decision fell within the Commissioner's "zone of choice."  42 U.S.C. §§ 405(g), 1383(c)(3); *see also Elam*, 348 F.3d at 125; *Jones*, 336 F.3d at 476; *Rogers*, 486 F.3d at 241; *Mullen*, 800 F.2d at 545.  I recommend that the court affirm the ALJ's decision to reject Ramirez's subjective symptom complaints and limit her to a reduced range of sedentary work.

### E.    Step Five Disability Determination

Ramirez argues that the ALJ erroneously determined that she could perform work in the national economy at Step Five.  ECF Doc. 13 at 22-25.  Specifically, Ramirez contends that the ALJ improperly relied on the VE's testimony because the ALJ's hypothetical question did not include the limitations in Dr. Friedman's opinion.  *Id.* at 23-24.  Further, Ramirez asserts that the ALJ erred by ignoring the VE's testimony that a hypothetical individual with Ramirez's age, education, experience, and RFC could not work if: (1) her ability to handle and finger was limited; or (2) she would be off task more than fifteen percent of the workday, be absent more than twice a month, or need more than the customary number of breaks.  *Id.* at 23.

The Commissioner responds that the ALJ applied proper legal standards and reached a conclusion supported by substantial evidence in determining that Ramirez was not disabled at Step Five.  ECF Doc. 15 at 13-14.  The Commissioner argues that the ALJ did not err in disregarding the VE's testimony regarding whether a hypothetical individual with handling, fingering, off-task behavior, and absenteeism limitations could work, because the ALJ was only required to include in his RFC finding and hypothetical questions the limitations that he found credible.  Id. at 13.  Thus, the Commissioner contends that the ALJ properly relied on the VE's testimony to determine that Ramirez able to perform work in the national economy and that she was not disabled.  Id. at 13-14.

At the final step of the sequential analysis, the burden shifts to the Commissioner to produce evidence as to whether the claimant can perform a significant number of jobs in the national economy.  Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 238 (6th Cir. 2002); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  An ALJ may determine that a claimant has the ability to adjust to other work in the national economy by relying on a vocational expert's testimony that the claimant has the ability to perform specific jobs.  Howard, 276 F.3d at 238.  A vocational expert's testimony in response to a hypothetical question is substantial evidence when the question accurately portrays the claimant's RFC.  See id. (stating that "substantial evidence may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments" (internal quotation marks omitted)); see also Lee v. Comm'r of Soc. Sec., 529 F. App'x 706, 715 (6th Cir. 2013) (unpublished) (stating that the ALJ's hypothetical question must "accurately portray[] a claimant's vocational abilities and limitations").  "An ALJ is only required to incorporate into a hypothetical question those limitations he finds credible."  Lee, 529 F. App'x at 715; see also Blacha v. Sec'y of Health &

*Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) ("If the hypothetical question has support in the record, it need not reflect the claimant's unsubstantiated complaints.").

The ALJ applied proper legal standards and reached a conclusion supported by substantial evidence in determining that Ramirez was not disabled at Step Five.  42 U.S.C. §§ 405(g), 1383(c)(3); *Elam*, 348 F.3d at 125.  Because the ALJ did not find that Ramirez had limitations that would cause her to be absent from work or off-task more than customarily tolerated, the ALJ was not required to incorporate such a limitation into his RFC finding. *Howard*, 276 F.3d at 238; *Lee*, 529 F. App'x at 715; *Blacha*, 927 F.2d at 231; (Tr. 17-21). Further, because the ALJ's hypothetical questions to the VE accurately represented the ALJ's ultimate RFC finding, the VE's testimony – that Ramirez could work as a charge account clerk, order clerk, and call-out operator – was substantial evidence supporting the ALJ's finding that Ramirez was not disabled.  *Howard*, 276 F.3d at 238; 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); (Tr. 22, 62-65).  Thus, the ALJ properly concluded that Ramirez was not disabled under the Social Security Act and denied her applications for DIB and SSI, and the court should not disturb that decision.  42 U.S.C. §§ 405(g), 1383(c)(3); *Jones*, 336 F.3d at 476; *Elam*, 348 F.3d at 125; *Rogers*, 486 F.3d at 241.

## VI.     Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Ramirez's application for disability insurance benefits be AFFIRMED.

Dated: June 19, 2019

Thomas M. Parker
United States Magistrate Judge

_____

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).